## Ecker v. Arch St. Theatre.    Kupperstein v. Arch St. Theatre.

M. S. Levy, for plaintiffs; Levinthal, Schofield & Kraus, for defendants.

MARTIN, P. J., July 3, 1928.—The plaintiffs, Jennie Kupperstein and Rose Ecker, were spectators of a play produced by defendants in a theatre conducted by them.

An electric fan attached to the ceiling of the theatre fell upon plaintiffs, causing personal injuries, for which these suits are brought to recover compensation. Both cases were tried at the same time and resulted in a verdict in favor of Jennie Kupperstein for $1000; for her husband, William Kupperstein, $200, and for Rose Ecker $800.

Motions were made for judgment non obstante veredicto. It is contended by defendants' counsel that there was no proof of negligence, and that the falling of the fan and consequent injury to plaintiffs did not establish a case of res ipsa loquitur.

Plaintiffs purchased tickets of admission entitling them to occupy seats in the theatre.

The fan was under the sole management of defendants, and its fall was an event which in the ordinary course of things does not occur. There was a presumption of negligence on the part of the defendants which the evidence did not rebut.

It was their duty to afford plaintiffs a safe position in the theatre to observe the play: Oil Co. v. Torpedo Co., 190 Pa. 350.

There had been an inspection of the fan several months before the accident, and the question was submitted to the jury to determine whether or not the fall of the fan was due to the negligence of defendants. There was conflicting testimony as to whether plaintiffs were struck by the falling fan, and this question was properly submitted for the determination of the jury, and the verdicts were warranted by the evidence.

Defendants claim that the damages awarded were excessive.

Jennie Kupperstein testified, "Something struck me over the head; I got dizzy and don't remember anything else, and after I recalled a little while after, my left wrist was cut, my knee was bruised and my stomach was all like cut into me—I don't mean cut into me—I felt like something cut me and the cut hurted me very bad. After that, I saw it was a part of the fan, because it was lying across my knee." She said it struck her head, her left wrist, her right knee and stomach. She was taken in a taxicab to the family doctor, and from there home and went to bed, suffering "fearful pain;" that the pains were getting worse when she stayed in bed, and she had to sit up or walk around, or sit down or lie down. She was confined to her room about three weeks, after which time she went downstairs, but could not get around much, as her feet were terribly swollen. The pain lasted about three months. The doctor attended her three or four times a week. She was pregnant at the time. She testified that she performed the housework before the accident, but was unable to do so without assistance after she was injured. She admitted that there were no marks on her body.

The doctor testified that he had attended her for years and knew that she had been pregnant about six months; that he examined her about two weeks before the accident and found her to be in normal condition; that when she came to his office on the night of the accident, she was suffering from shock, bruises on her left wrist and right knee, a discoloration on her abdomen and abrasions. He kept her in his office a couple of hours to quiet her, and sent her home and ordered a complete rest. He treated her mostly for shock and pain in her leg. Her right leg was swollen down to the ankle. She complained of pain in the abdomen and severe headaches. The wrist cleared up in a couple of weeks, but the right knee did not clear up for a long period. She was under his care for three weeks every day, and after that period, two or three times a week. His bill was $84.

Rose Ecker testified that the fan came down and struck her on the head, bruising her face and ear, and left side and shoulder and her knee and the inside of her mouth were injured. She did not see it fall, but she saw it lying near her after she was hurt. She went to the doctor's office in a taxicab, stayed in his office about three hours, went to her sister's home and went to bed. She was confined to bed four weeks, and under the doctor's care for seven weeks. She was employed fitting dresses and earned $25 a week, but did no work during the seven weeks. She was hurt on the top of her head, on the left side of her face, the left shoulder, in the inside of her mouth and on her chest and knee. Her face was cut and she had pain in her ear. Her

shoulder was cut, her chest was swollen, but there were no black and blue marks. Her knees were bruised. She testified she still suffers pain.

Doctor Levin testified that she came to his office on the night of the accident, suffering from severe shock, and he gave her treatment to allow her to rest and "sustain" herself. The left side of her hand, face and neck were contused and abraded. The interior of her mouth, her shoulder and as far down as the middle of the chest and both knees had abrasions and contusions. She was in bed about three weeks, and visited his office for two months afterwards. His bill was $70.

To measure pain and suffering by a financial standard is one of the duties of the jury. The compensation awarded in these cases was full and adequate, and perhaps slightly excessive, but the awards were not such as to shock the conscience of the court nor to demand the submission of the cases to another jury.

And now, to wit, July 3, 1928, the motions for judgment *non obstante veredicto* are refused and the rules for new trials are discharged.